O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SHERI LYNN NACE,                          )   NO. EDCV 14-00641-MAN
                                          )
                      Plaintiff,          )
                                          )   MEMORANDUM OPINION
          v.                              )
                                          )   AND ORDER
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social             )
Security,                                 )
                                          )
                      Defendant.          )
_____   )

# INTRODUCTION

Plaintiff filed a Complaint on April 9, 2014, seeking review of the denial of plaintiff's application for disability insurance benefits ("DIB"). On May 13, 2013, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 7, 10.) On March 16, 2015, the parties filed a Joint Stipulation ("Joint Stip.") in which plaintiff seeks an order reversing the Commissioner's decision and either remanding the matter for further administrative proceedings or ordering the payment of benefits. (Joint Stip. at 26.) The Commissioner requests that the ALJ's decision be affirmed or, in the alternative, that the case be remanded for further proceedings. (*Id*. at 26-27.) The Court has taken the matter

under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On February 10, 2011, plaintiff, then 49 years old,[1] applied for a period of disability and DIB. (Administrative Record ("A.R.") 157.) Plaintiff had filed a prior application for benefits, which the Commissioner denied in September 2009. (*Id.* 73.)

Plaintiff alleged disability commencing August 1, 2006, due to bipolar disorder, mood swings, mood disorder, and hand tremors. (A.R. 157, 189.) Plaintiff had previously worked as a teacher's aide. (*Id.* 18, 181.)

The Commissioner denied plaintiff's application initially (A.R. 62-70) and on reconsideration (*id.* 72-83). On April 17, 2012, plaintiff requested a hearing. (*Id.* 101.) On December 27, 2012, plaintiff, who was represented by counsel, testified before Administrative Law Judge Lynn Ginsburg ("ALJ"). (*Id.* 25-53.) Ronald Hatakeyama, a vocational expert ("VE"), also testified. (*Id.* 53-60; *see also id.* 146.) On January 18, 2013, the ALJ issued an unfavorable decision denying plaintiff's claim for DIB. (*Id.* 10-20.) On February 12, 2013, the Appeals Council denied plaintiff's request for review. (*Id.* 1-3.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity from the alleged onset date of August 1, 2006, through her date last insured on December 31, 2011. (A.R. 12.) The ALJ further found that, through the date last insured, plaintiff had the following severe

---

[1] Plaintiff was born on May 27, 1961 (A.R. 157.) Accordingly, plaintiff turned 50 -- and entered the closely approaching advanced age category -- between the date of her application and December 31, 2011, the date she was last insured. *See* 20 C.F.R. § 404.1563.

1   impairments:  bipolar disorder; hypertension; fine hand tremor; and polysubstance abuse in an
2   unknown state of remission.  (*Id.*)  The ALJ also concluded that plaintiff's impairments do not
3   satisfy the requirements of a listed impairment in 20 C.F.R. part 404, subpart P, appendix 1 (20
4   C.F.R. §§ 404.1520(d), 404.1525, 404.1526).[2]  (*Id.* 12-13.)

6       The ALJ determined that, through the date last insured, plaintiff had the residual functional
7   capacity ("RFC") to perform medium work with the following limitations:

9       [Plaintiff] can lift and/or carry 50 pounds occasionally and 25 pounds frequently; she
10      can stand and/or walk for six hours out of an eight-hour workday with regular
11      breaks; she can sit for six hours out of an eight-hour workday with regular breaks;
12      she cannot climb ladders, ropes or scaffolds; she is precluded from jobs requiring
13      exposure to unprotected heights and the use of moving hazardous machinery; she
14      is limited to simple, routine and repetitive tasks; she requires a work environment
15      free of fast paced production requirements; she requires a job with simple work
16      related decisions, superficial to no interaction with the public and occasional contact
17      with coworkers; and [she] is limited to occasional bilateral fine manipulation.

19  (A.R. 13-14.)  The ALJ found that through the date last insured, plaintiff was unable to perform
20  her past relevant work as a teacher's aide but could have performed other jobs that exist in
21  significant numbers in the national economy, including the jobs of kitchen helper (DOT 318.687-
22  010), industrial cleaner (DOT 381.687-018), and linen room attendant (DOT 222.387-030).  (*Id.*
23  18-19.)  Accordingly, the ALJ found that plaintiff was not disabled.  (*Id.* 19.)
24  \\
25  \\
26

27      [2]  In reaching this conclusion, the ALJ expressly considered whether plaintiff met the
28  criteria of listings 12.06 for anxiety-related disorders and 12.09 for substance addiction disorders.
    (A.R. 13.)

3

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for that of the Commissioner, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); Desrosiers v. Sec'y of Health and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn, 495 F.3d at 630; see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r of Soc. Sec., 454 F.3d

4

1050, 1055 (9th Cir. 2006)); *see also* <u>Carmickle v. Comm'r of Soc. Sec.</u>, 533 F.3d 1155, 1162 (9th Cir. 2008).

**DISCUSSION**

Plaintiff alleges that the ALJ committed the following three errors:  (1) she improperly evaluated the opinion of plaintiff's treating psychiatrist (Joint Stip. at 17-21); (2) she improperly evaluated the opinion of the examining physician (*id.* 11-14); and (3) she improperly relied on VE's testimony that conflicted with the DOT (*id.* 3-8).

**I.    The ALJ Properly Evaluated The Opinion Of Plaintiff's Treating Psychiatrist.**

On May 2, 2006, Dr. Rajendra Patel, plaintiff's attending psychiatrist during her hospitalization at Canyon Ridge Hospital, completed a form requested by plaintiff's health insurance company.[3]  (A.R. 286-87.)  Dr. Patel stated that plaintiff required treatment for symptoms including mood swings, suicidal thoughts, and difficulty concentrating. (*Id.* 286.)  Dr. Patel opined that plaintiff was "unable to function" between March 28, 2006, the date these symptoms first appeared, and April 26, 2006, and in terms of an eight-hour workday, plaintiff's symptoms rendered her "incapable of minimal activity or sedentary work." (*Id.* 286.)  Dr. Patel assessed plaintiff with a GAF score of 50,[4] indicating serious symptoms, and diagnosed plaintiff with bipolar disorder, moderate, and polysubstance dependence. (*Id.* (listing plaintiff's DSM-IV axes as 296.62 for axis I and 204.80 for axis II).)  Dr. Patel stated that, during that one-month period, plaintiff attended day treatment two to three times per week. (*Id.*)  Dr. Patel last saw

---

[3]  It is unclear from the record whether Dr. Patel completed the form in connection with a health insurance claim or a claim for long term disability insurance. (*See generally* A.R. 286-87.)

[4]  A GAF score between 41 and 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV 34.

plaintiff for treatment on April 11, 2006, the same date of plaintiff's last comprehensive exam, according to the form completed by Dr. Patel.  (*Id.*)  On February 10, 2011, plaintiff applied for a period of disability and DIB, alleging disability commencing a full three months after the one-month period of treatment described by Dr. Patel.  (*See id.* 157.)

The ALJ assigned Dr. Patel's opinion "little weight," because:  it was not supported by objective evidence; it was inconsistent with the record as whole; Dr. Patel did not provide an explanation for the opinion rendered; Dr. Patel did not identify any specific functional limitations that prevented plaintiff from working; and Dr. Patel identified a period of disability that did not meet the twelve-month durational requirement of the Social Security regulations.  (A.R. 16.)  The ALJ's reasons for according little weight to Dr. Patel's opinion are legally sufficient and do not warrant reversal.

When a treating or examining physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons that are supported by substantial evidence.  Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  When it is contradicted by another doctor's opinion, a treating or examining physician's opinion may be rejected only if, after considering the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) for evaluating medical opinions, the ALJ articulates "specific and legitimate" reasons supported by substantial evidence in the record.  Garrison, 759 F.3d 995, 1012 (9th Cir. 2014); Orn, 495 F.3d at 632.

Although Dr. Patel is the only medical source who opined that plaintiff's mental impairments rendered her unable to function, this opinion was limited to the one-month period in which plaintiff received treatment at the Canyon Ridge Hospital (from March 28, 2006, through April 26, 2006) and assessed no functional limitations that would adversely affect plaintiff's ability to work after that period.  (A.R. 386.)  Accordingly, the ALJ correctly determined that Dr. Patel's opinion was not controlling on the question of disability, because it did not address plaintiff's ability to

6

1   perform substantial gainful activity over the course of a 12-month period.  *See* 42 U.S.C. §

2   423(d)(1)(A).

3

4        In addition, the ALJ correctly observed that the medical record as a whole was inconsistent

5   with plaintiff's position that her inability to function while under Dr. Patel's care continued after

6   she stopped receiving treatment at Canyon Ridge Hospital.  First, plaintiff's sparse treatment

7   records show that, following her release from Dr. Patel's care, plaintiff did not seek psychiatric

8   treatment again for five years. (A.R. 304-12 (6/10/11 rapid psychiatric evaluation at Riverside

9   County Hospital).)  She also received psychiatric treatment only once between the date of the

10  alleged onset of her disability (August 1, 2006) and the date on which she was last insured

11  (December 31, 2011) (*id.*) and only occasionally sought psychiatric treatment thereafter (*id.* 397-

12  98 (7/19/12 rapid psychiatric evaluation at Riverside County Hospital), 367 (8/30/12 mental health

13  assessment with the Riverside County Department of Health's Main Street Clinic)).  Second,

14  plaintiff's treatment records show that no medical source assessed severe functional limitations,

15  which would preclude her from working in the period between the date plaintiff's disability

16  allegedly began and her date last insured.  (*See* A.R. 302-312 (6/10/12 rapid psychiatric

17  evaluation at Riverside County Hospital - plaintiff demonstrated "good" attention, memory,

18  judgment, insight, and impulse control, diagnosed with bipolar disorder, prescribed Wellbutrin,

19  Topamax, Lamictal, and Benadryl, discharged with instructions avoid street drug and alcohol use);

20  *see also id.* 397-89 (7/19/12 - rapid psychiatric evaluation at Riverside County Hospital - plaintiff

21  demonstrated calm and cooperative behavior, clear and coherent speech, appropriate affect, goal

22  directed thought process, "good" attention and concentration, average intelligence, and "fair"

23  memory, judgment, insight, and impulse control and adjustments were made to her prescribed

24  medication).)

25

26       The opinions of the two examining psychiatrists, Dr. Reynaldo Abejuela, a diplomate of the

27  American Board of Psychiatry and Neurology, and Dr. Thaworn Rathana-Nakintara, a board eligible

28  psychiatrist, are also inconsistent with plaintiff's position that her inability to function throughout

7

1    her alleged period of disability.   On June 23, 2011, Dr. Abejuela examined plaintiff at the

2    Commissioner's request.   Plaintiff described her symptoms as:  difficulty concentrating; racing

3    thoughts; problems with sleep, appetite, weight, and memory; impulsivity; and spending sprees.

4    (A.R. 320-21.)   Plaintiff also reported a history of alcohol, marijuana, and methamphetamine

5    abuse.  (*Id.* 321.)  Dr. Abejuela administered a series of tests and found that plaintiff could

6    remember 3/3 items after three and five minutes, do "serial 3s and 7s," and simple math but

7    could not correctly name either the last president of the United States or the capital of the United

8    States.  (*Id.* 323-24.)  He diagnosed her with ADHD, bipolar disorder NOS, substance induced

9    mood disorder, and polysubstance dependence in remission.  (*Id.* 324.)  He found that plaintiff's

10   reasoning and comprehension were intact and her cognitive functioning within normal limits.  (*Id.*

11   325.)  He further found that plaintiff had mild impairments in:  concentration, persistence, and

12   pace; social functioning; understanding, carrying out, and remembering complex instructions;

13   responding appropriately to coworkers, supervisors, and the public; responding appropriately to

14   usual work situations; and dealing with changes in a routine work setting.  (*Id.* 325-26.)  He

15   identified no restriction in plaintiff's ability to understand, carry out, and remember simple

16   instructions and perform daily activities, and he found no repeated episodes of emotional

17   deterioration in work-like settings.  (*Id.* 325.)  Dr. Abejuela opined that, if plaintiff complied with

18   her medication regime and abstained from street drugs and alcohol, her psychiatric symptoms

19   would "abate in the next few months."  (*Id.* 326.)

20

21        On February 13, 2012, Dr. Rathana-Nakintara, a board eligible psychiatrist, examined

22   plaintiff and reached the same conclusion.  Plaintiff told Dr. Rathana-Nakintara that she was

23   "emotional," "severely manic most of the time," "easily irritated, impulsive, and distracted," and

24   has a "short temper."  (A.R. 348.)  She reported that she has used methamphetamine and

25   marijuana since the age of 18 until the present time.  (*Id.* 349.)  After a series of tests, Dr.

26   Rathana-Nakintara observed that plaintiff: registered 3 out of 3 items at 0 minutes and 3 out of

27   3 items at 5 minutes; did "well" on serial 3s subtraction but asked for a paper and pencil to do

28   serial 7s subtraction; spelled the word "world" forward and backward; identified the current

president of the United States, as well as two past presidents; identified the capitals of the United States and California; and responded appropriately to imaginary situations requiring social judgment and knowledge of norms. (*Id.* 350-51.) Dr. Rathana-Nakintara diagnosed plaintiff with mood disorder NOS and polysubstance dependence, amphetamine and cannabis, and assessed her with a GAF score of 65,[5] indicating mild symptoms. (*Id.* 351.) He found that plaintiff exhibited no difficulty:  interacting with the clinic staff or himself; maintaining composure; maintaining even temperament; and maintaining social functioning. (*Id.* 351.) Additionally, he found that plaintiff "can focus and maintain attention" and "has no difficulties in concentration, persistence, and pace." (*Id.* 351.) He opined that plaintiff would have no limitations:  performing both simple and repetitive tasks and detailed and complex tasks; completing a normal workday or work week; accepting instructions from supervisors; and interacting with coworkers and the public. (*Id.* 351.) Accordingly, he stated that plaintiff was able to perform work activities on a consistent basis without special or additional supervision and could handle the usual stresses, changes, and demands of gainful employment. (*Id.* 351.) Like Dr. Abejuela, Dr. Rathana-Nakintara concluded that "[i]f [plaintiff] were totally abstinent from methamphetamine and marijuana, there would be no limitations at all." (*Id.* 352.)

Thus, the record plainly shows that:  (1) plaintiff had a one-month period of decompensation in 2006, during which she was treated by Dr. Patel and "unable to function"; and (2) in the period between the date of plaintiff's release from Dr. Patel's care and the date on which she was last insured, no psychiatrist or other medical source opined that plaintiff's mental impairment precluded her from, or severely limited her ability to, work.  Instead, two psychiatrists, Dr. Abejuela and Dr. Rathana-Nakintara, agreed that, if plaintiff abstained from illegal street drugs and alcohol, she would have no functional limitations at all.  Accordingly, the ALJ did not err in finding that Dr. Patel's opinion, regarding plaintiff's inability to function in March and April 2006, was not a controlling opinion on the ultimate question of disability and assigning it little weight.

---

[5] A GAF score of 65 indicates some mild symptoms or difficulty in social, occupational, or school functioning.

9

## II.    **The ALJ Properly Evaluated The Opinion Of The Consulting Physician.**

On February 7, 2012, Dr. Aida D. Cruz, a board eligible internist, performed a consultative examination of plaintiff. (A.R. 338-43.)  Dr. Cruz observed that plaintiff experienced "fine hand tremors at rest," but she also found that plaintiff's "strength is 5/5 in all extremities," she has no impairments in her sensation or reflexes, and she retains a full range of motion in her shoulders, elbows, wrists, and hands. (*Id.* 341-42.) Dr. Cruz diagnosed plaintiff with hypertension (112/100) and hand tremors.  (*Id.* 342.)  She opined that plaintiff is able to:  "lift and carry 100 pounds occasionally, and 50 pounds frequently[;] stand and walk for six hours per eight-hour workday, and sit for six hours out of an eight-hour workday[;]" but she "is restricted from performing fine and gross manipulation with both hands due to the tremors." (*Id.* 343.)  Dr. Cruz assessed plaintiff with no other functional limitations.  (*Id.*)

With respect to Dr. Cruz's assessment, the ALJ wrote:

The consultative examiner at Exhibit 8F limited [plaintiff] to no fine or gross manipulation due to her fine tremor, but there are no objective neurological findings on examination; and it does not appear that she was ever worked up for her tremors.  Nevertheless, [plaintiff's] tremors were factored in the maximum residual functional capacity assessment by reducing her to no more than occasional bilateral fine hand manipulation.

(A.R. 15.)

Plaintiff contends that the ALJ erred, because he rejected Dr. Cruz's opinion that plaintiff was limited in her ability to perform gross manipulation without adequate explanation. (Joint Stip. at 12.)  However, Dr. Cruz's opinion was contradicted by the opinion of Dr. Sean To, a board eligible internist, who examined plaintiff on July 5, 2011. (A.R. 331.)  Like Dr. Cruz, Dr. To noted

1  "mild resting tremors" in plaintiff's hands (*id.* 333) but found that these did not cause any

2  functional restrictions to plaintiff's ability to use her hands or engage in fine and gross

3  manipulation (*id.* 334).   Accordingly, the ALJ was entitled to reject Dr. Cruz's assessment that

4  plaintiff was limited in her ability to engage in gross manipulation for "specific and legitimate

5  reasons" supported by substantial evidence.  *See* Hill v. Astrue, 698 F.3d 1153, 1159-60 (9th Cir.

6  2012).

7

8          The ALJ was also entitled to reject Dr. Cruz's assessment based on the ALJ's determination

9  that Dr. Cruz's opinion was "brief, conclusory, and inadequately supported by clinical findings."

10  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing Tonapetyan v. Halter, 242 F.3d

11  1144, 1149 (9th Cir. 2001)); (*see also* A.R. 15, 17).   The ALJ's assessment of Dr. Cruz's opinion

12  is correct.   Dr. Cruz did not support her opinion with specific findings regarding plaintiff's ability

13  to engage in gross manipulation.  To the contrary, as stated above, Dr. Cruz found that plaintiff

14  demonstrated normal strength and range of motion in her upper extremities, and she did not

15  observe plaintiff experience functional limitations resulting from her fine hand tremors.

16

17          There are also no other medical records that support Dr. Cruz's assessment.  As stated

18  above, Dr. To identified no functional limitations related to plaintiff's hand tremors, and as the ALJ

19  observed, plaintiff was never "worked up" for her tremors.  In addition, the statements of plaintiff

20  and the lay witnesses about plaintiff's abilities and daily activities are inconsistent with Dr. Cruz's

21  opinion.   First, plaintiff did not allege that hand tremors -- or difficulty performing job duties

22  requiring gross manipulation -- resulted in her departure from her job as a teacher's aide (A.R.

23  31 (stating that she left because her concentration and ability to stay on task was "off")) or made

24  it difficult to find new employment (*id.* 51).   Second, plaintiff's daily activities reveal that she is

25  able to perform activities requiring gross manipulation despite her hand tremors.   Specifically,

26  plaintiff stated that she cooks sometimes, paints two to three times a week, does a load of laundry

27  now and then, goes grocery shopping, does the dishes, pulls weeds, and takes out the trash.  (*Id.*

28  49, 241, 243.)  Plaintiff indicated that she has trouble performing some of these activities due to

1  her mental impairments, *i.e.,* that she sometimes forgets to turn the stove off and tries to avoid

2  shopping because she does not like crowds, but plaintiff indicated that she did not have any

3  difficulty painting, pulling weeds, or performing her other daily activities due to her hand tremors

4  except that she is "too shaky to use hot oil" while cooking.  (*Id.*)  The third party function reports

5  completed by plaintiff's boyfriend, Nicholas Gilland, and her friend, Steven Dey, similarly indicate

6  that, although plaintiff's hands shake, the tremors did not restrict her ability to perform activities

7  requiring gross manipulation.  (*Id.* 208-15 (Gilland's report), 250-57 (Dey's report).)  Gilland

8  stated that plaintiff:  has no problem with any aspect of her personal care, including dressing,

9  bathing, and caring for her hair (*id.* 209); shops by herself for paint, food, books, and "basic

10  needs" (*id.* 211); and does the laundry, cleaning, and yard work without difficulties related to her

11  hand tremors (*id.* 210).  Dey similarly stated that plaintiff has no problem with any aspect of her

12  personal care (*id.* 251) and washes the dishes, shops for food and cosmetics, paints, and takes

13  out the trash without difficulties related to her hand tremors (*id.* 252-54).

14

15    In sum, the record does not support Dr. Cruz's conclusory opinion that plaintiff is restricted

16  from performing gross manipulation with both hands, and thus, the ALJ did not err in discounting

17  Dr. Cruz's opinion as conclusory and not supported by objective findings.

18

19    **III.  The ALJ Properly Relied On The VE's Testimony That Plaintiff Could**

20    **Perform The Occupations of Kitchen Helper, And Any Other Error At Step**

21    **5 Is Harmless.**

22

23    **A.  Background**

24

25    At step 5 of the sequential analysis, the ALJ is required to consider the potential

26  occupations that the plaintiff may be able to perform given her RFC.  In this case, the ALJ asked

27  the VE whether jobs exist in the national or regional economies that could be performed by an

28  individual with plaintiff's age, education, and past work experience who is:  limited to simple,

routine, repetitive tasks performed in a work environment free of production requirements and involving only simple work related decisions; unable to climb ladders, ropes, or scaffolds; precluded from exposure to unprotected heights; precluded from the use of moving hazardous machinery; limited to superficial or no direct interaction with the public and only occasional interaction with co-workers; and limited to occasional bilateral fine manipulation. (A.R. 55, 56, 57.) The VE opined that an individual meeting this description could perform jobs that exist in significant numbers in the national and regional economies, including those of kitchen helper (DOT 318.687-010) with 10,000 jobs in the regional economy and 500,000 nationally, industrial cleaner (DOT 381.687-018) with 6,000 jobs in the regional economy and 1.1 million nationally, and linen room attendant (DOT 222.387-030) with 2,000 jobs in the regional economy and 350,000 nationally. (*Id.* 56-57.)

The ALJ determined that the VE's testimony was consistent with the information in the DOT and, based on the VE's testimony, concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (A.R. 19.) Plaintiff now contends that the ALJ erred in relying on the VE's testimony, because the VE's testimony that plaintiff could perform the jobs of kitchen helper, industrial cleaner, and linen room attendant was inconsistent with the DOT's descriptions of the duties and requirements of each of those jobs. (*See* Joint Stip. at 3-8.) Specifically, plaintiff states that, according to the DOT, the jobs of kitchen helper and industrial cleaner would expose plaintiff to hazardous moving machinery (*id.* at 4-6) and the job of linen room attendant would require plaintiff to perform duties involving Level Three Reasoning, which conflicts with plaintiff's limitation to "simple, routine, repetitive tasks with simple work related decisions" (*id.* 6-8).

### B.   Legal Standard

In determining whether plaintiff can perform other work that exists in significant numbers in the national economy, the ALJ relies on the Dictionary of Occupational Titles ("DOT"), "the

1    SSA's primary source of reliable job information," which describes the requirements for each listed

2    occupation. <u>Zavalin v. Colvin</u>, 778 F.3d 842, 845-46 (9th Cir. 2015).  The ALJ is also entitled to

3    rely on the testimony of vocational experts who testify about specific occupations a plaintiff can

4    perform in view of her residual functional capacity.  <u>Id.</u> at 846; <u>see also</u> <u>Bayliss</u>, 427 F.3d at 1218

5    (ALJ may rely on "any reliable job information," including the testimony of a VE).  However, when

6    the ALJ hears VE testimony, Social Security Ruling 00-4p ("SSR 00-4p") requires her to ask the

7    VE if the testimony provided conflicts with the information in the DOT and, if the VE's testimony

8    "appears" to conflict with the DOT, to obtain a reasonable explanation for the conflict.  SSR 00-4p;

9    <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007).

10

11   The ALJ may choose to accept testimony from a VE that contradicts the DOT, but only if

12   the record contains "persuasive evidence to support the deviation."  <u>Tommasetti v. Astrue</u>, 533

13   F.3d 1035, 1042 (9th Cir. 2008).  When the ALJ fails to identify and resolve an apparent

14   inconsistency, a court may find that the ALJ's decision is not supported by substantial

15   evidence, <u>see, e.g.,</u> <u>Zavalin</u>, 778 F.3d at 846, or that the error is rendered harmless by either the

16   absence of an actual conflict with the DOT or the VE's articulation of "sufficient support" for his

17   conclusion, <u>Massachi</u>, 486 F.3d at 1154 n.19.

18

19   **C.   Analysis**

20

21   The ALJ asked the VE if he understood "that if you give us an opinion which conflicts with

22   the information in the Dictionary of Occupational Titles that you need to advise us of the conflict

23   and the basis for your opinion," and the VE answered, "Yes, I will."  (A.R. 54.)  However, the VE

24   identified no discrepancies between his testimony that plaintiff could perform the jobs of kitchen

25   helper, industrial cleaner, and linen room attendant and the information in the DOT.

26

27   Although the ALJ may have erred in failing to identify and reconcile discrepancies between

28   the DOT and the VE's testimony that plaintiff could perform the jobs of industrial cleaner and linen

1  room attendant, plaintiff has not persuaded the Court that a discrepancy exists between the DOT

2  and the VE's testimony that plaintiff could perform the job of kitchen helper.   Furthermore,

3  because there are a significant number of kitchen helper jobs in the regional and national

4  economies (10,000 and 500,000 respectively), any error with respect to the ALJ's reliance on the

5  VE's testimony that plaintiff can perform the jobs of industrial cleaner and linen room attendant

6  is harmless, because it has no effect on the ultimate nondisability determination.  *See* Carmickle,

7  533 F.3d at 1162.

9  According to the DOT, a kitchen helper "[p]erforms *any combination* of following duties to

10  maintain kitchen work areas and restaurant equipment and utensils in clean and orderly

11  condition":

13  Sweeps and mops floors.  Washes worktables, walls, refrigerators, and meat blocks.

14  Segregates and removes trash and garbage and places it in designated containers.

15  Steam-cleans or hoses-out garbage cans.  Sorts bottles, and breaks disposable ones

16  in bottle-crushing machine.  Washes pots, pans, and trays by hand.  Scrapes food

17  from dirty dishes and washes them by hand or places them in racks or on conveyor

18  to dishwashing machine.   Polishes silver, using burnishing-machine tumbler,

19  chemical dip, buffing wheel, and hand cloth.  Holds inverted glasses over revolving

20  brushes to clean inside surfaces.   Transfers supplies and equipment between

21  storage and work areas by hand or by use of handtruck.  Sets up banquet tables.

22  Washes and peels vegetables, using knife or peeling machine.  Loads or unloads

23  trucks picking up or delivering supplies and food.

25  DOT 318.687-010 (emphasis added).

27  Plaintiff now contends that the job of kitchen helper would expose plaintiff to hazardous

28  machinery, because plaintiff could be asked to, *inter alia*, steam clean garbage cans, break

disposable bottles in a bottle crushing machine, place dirty dishes on a conveyor belt to a dishwasher, use a burnishing-machine tumbler to polish silver, and peel vegetables with a peeling machine.  (Joint Stip. at 4-5.)  Plaintiff offers no justification for her belief that a steam cleaner, conveyor belt, dishwasher, and other machines that might be used by kitchen helper are hazardous, and she identifies no potential hazards associated with using these machines.  Instead, plaintiff pins her argument on her own personal assessment of the perils of using the kitchen equipment identified in the DOT's description of the kitchen helper position.

Plaintiff's personal opinion is not a reliable source of job information, and she cites no legal authority for her contention that the Court should overlook the two designated sources of reliable job information in this case -- the DOT and the VE's testimony -- in favor of her own subjective beliefs.  *See* 20 C.F.R. § 404.1566(d)-(e); Bayliss, 427 F.3d at 1218.  Accordingly, plaintiff's argument is devoid of merit, and the ALJ committed no error warranting reversal at step 5 of the sequential analysis.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

## CONCLUSION

For the reasons stated above, the Court finds that the Commissioner's decision is supported by substantial evidence and free from material legal error. Neither reversal of the ALJ's decision nor remand is warranted.

Accordingly, IT IS ORDERED that Judgment shall be entered affirming the decision of the Commissioner of the Social Security Administration.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED: May 18, 2015

_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

17